UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

02 FEB -5 PM 1: 18

U.S. DISTRICT COURT
N.D OF ALABAMA

JACQUELINE FRANKLIN,          )
                             )
        Plaintiff,            )
                             )
vs.                          )          Civil Action No. CV 00-S-1852-S
                             )
DAVID VOLKERT AND            )
ASSOCIATES, INC.             )
                             )          ENTERED
        Defendant.           )
                                        FEB - 5 2002

## MEMORANDUM OPINION

Jacqueline Franklin initially claimed that her employer, David Volkert and Associates, Inc., subjected her to harassment, and denied her promotions and comparable pay, because of her race (African-American) and gender (female) in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* She also alleged that Volkert intentionally and willfully refused to pay her at the same rate as male employees performing the same or substantially similar work in violation of the Equal Pay Act, as amended, 29 U.S.C. § 206(d). Finally, she claimed that Volkert retaliated against her for asserting her federally protected rights in violation of Title VII and § 1981. After conducting discovery, plaintiff concedes that her Title VII race and gender-based harassment claims, her Title VII gender-based wage disparity claim, and her Equal Pay Act claims are due to be dismissed. The action now is before the court on defendant's motion for summary judgment as to plaintiff's remaining claims. Upon consideration of the pleadings, evidentiary submissions, and briefs, the court concludes that the motion is due to be granted.

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is



proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)) (internal quotation marks and citations omitted); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

## I. SUMMARY OF FACTS

David Volkert and Associates, Inc. ("Volkert") is an engineering and architectural firm based in Mobile, Alabama. It specializes in waterfront dock construction, bridge building, and heavy foundation projects. The company and its subsidiaries employ approximately 500 people, and have offices over much of the southeastern United States. The Chief Executive Officer and Senior Vice President are located in Mobile. The Birmingham office is supervised by a Vice President/Office

Manager.[1]

In 1994, Audrey Perine, Volkert's Assistant Vice President of Marketing in the Birmingham office, resigned in order to accept a position as Assistant General Manager of the Birmingham Water Works Board.  Perine had primarily performed marketing duties while with Volkert; however, because  she held a graduate engineering degree, Perine occasionally assisted in technical aspects of the engineering firm.[2]  Perine, like plaintiff, is an African-American. After Perine's resignation, Volkert began looking for a person to fill a marketing position in its Birmingham office.[3]

Shortly after Perine's resignation, plaintiff's sister-in-law informed plaintiff that there was a potential job opening in Volkert's Birmingham office.  Plaintiff delivered a resume to the office.[4] Plaintiff has no training in engineering, and had never handled sales or marketing for a professional engineering service firm; however, she graduated from the University of Alabama at Birmingham in 1986 with a B.A. in public relations.[5]  Also, plaintiff gained sales experience while working for Bristol-Myers Squibb, Johnson & Johnson, Pitney Bowes, BellSouth National Publishing, and BlueCross BlueShield.[6]

Plaintiff interviewed for the Birmingham marketing position with Birmingham Vice President/Office Manager, Phillip Garratt.[7]  She then interviewed with Senior Vice President, Perry

---

[1] Defendant's evidentiary submission (doc. no. 38), Tab E, at unnumbered page , ¶ 2.

[2] *Id.*, Tab C, at 151.

[3] *Id.*, Tab E, at unnumbered page 1, ¶ 3.

[4] *Id.*, Tab A (plaintiff's Dec. 13, 2000, deposition), at 75-76.

[5] *Id.*, Tab A, Exhibit 1, at unnumbered page 6.  All exhibits attached to plaintiff's Dec. 13, 2000, deposition and plaintiff's July 5, 2001, deposition appear in the record immediately after plaintiff's July 5, 2001, deposition under Tab A.

[6] *Id.*, Tab A, Exhibit 1, at unnumbered page 3.

[7] Defendant's evidentiary submission (doc. no. 38), Tab A (plaintiff's Dec. 13, 2000, deposition), at 77.

Hand, and Vice Chairman of the Board, James Faulkner.[8]  Finally, she interviewed with Volkert's

Chairman and Chief Executive Officer, Keith King.[9]  Plaintiff asserts that, during this interview,

King made her a firm offer of a base salary, and that he also said it would be easy to make

production bonuses a part of her compensation package.[10]  Plaintiff accepted King's offer, and began

working as a Marketing Executive in the Birmingham office during April of 1994.[11]  Plaintiff's

annual salary and position titles since 1994 are as follows:

| **Date** | **Position Title** | **Annual Salary** |
|---|---|---|
| 4/14/94 | Marketing Executive | $45,000 |
| 5/25/95 | Marketing Executive | $47,711 ($2,700/6.02% increase) |
| 8/15/96 | Marketing Manager | $50,715 ($3,004/6.3% increase) |
| 5/22/97 | Marketing Manager | $54,700 ($3,985/7.9% increase) |
| 8/27/98 | Marketing Manager | $56,746 ($2,046/3.7% increase) |
| 9/23/99 | Marketing Manager | $58,763 ($2,017/3.6% increase) |
| 11/2/00 | Marketing Manager | $64,780 ($6,017/10.24% increase)[12] |

Thus, from the beginning of her employment until November 2, 2000, plaintiff's pay was increased

$19,780, or 44% ($64,780 - 45,000 = 19,780 ÷ 45,000 = 0.43955).  Plaintiff's job responsibilities

from 1994 forward have been approximately eighty to ninety percent marketing and ten to twenty

percent public relations.[13]

Since her initial hiring in 1994, plaintiff's immediate supervisor has been Phillip Garratt, the

Vice President/Office Manager for Volkert's Birmingham office.  Garratt in turn reports to Rodney

Summerford, a Senior Vice President in the company's Mobile office.  Summerford supervises the

---

[8] *Id.*, at 81.

[9] *Id.*, at 106-107.

[10] *Id.* at 107-108.

[11] *Id.*, Tab E, at unnumbered page 1, ¶ 3.

[12] *Id.*, Tab G, at unnumbered page 4.

[13] Defendant's evidentiary submission (doc. no. 38), Tab B, at 36-37.

marketing and other functions of the Birmingham office, and reports directly to Keith King.[14]

On her 1996 employee appraisal form, plaintiff requested a promotion to Assistant Vice President in Marketing.[15]   Although such promotions do not entail any change in job duties, they constitute a change in status and are accompanied by additional insurance benefits and possibly an increase in pay.[16]   The process for selecting an employee for Assistant Vice President is fairly informal.  The immediate supervisor may nominate the employee for a promotion, or the supervisor above the level of an employee's immediate supervisor may initiate such a discussion.  Once a positive consensus is reached between the supervisors, the employee is promoted.[17]

Plaintiff also asserts that she is entitled to receive annual bonus awards.  Bonus awards at Volkert are based on informal, subjective criteria which include the marketing achievements and profitability of the office, as well as the productivity of the individual employee.[18]  Volkert conducts annual performance evaluations (which it calls "appraisals") as a means of evaluating the productivity of individual employees.[19]  During the appraisal process, the employee is provided with an appraisal form, which the employee is required to return to his or her immediate supervisor following completion of the "employee comment" section.  The supervisor then completes his or her portion of the appraisal form, and meets with the employee to discuss any comments.[20]  Plaintiff asserts that the annual appraisals of her work performance are discriminatory based on her race and

---

[14] Plaintiff's evidentiary submission (doc. no. 43), Tab 1, at 44.

[15] Defendant's evidentiary submission (doc. no. 38), Tab A, Exhibit 8, at unnumbered page 3.

[16] Plaintiff's evidentiary submission (doc. no. 43), Tab 3, at 82-83.

[17] *Id.*, Tab 2, at 123.

[18] *Id.*, Tab 3, at 53, 88.

[19] Defendant's evidentiary submission (doc. no. 38), Tab A, Exhibit 6, at unnumbered page 4.

[20] *Id.*, Tab A (plaintiff's Dec. 13, 2000, deposition), at 265-66.

gender.

Plaintiff's first employee appraisal began in April of 1995, one year after the beginning of her employment. On the employee comment portion she identified only one project that had been awarded to Volkert as a result of her efforts during her first year with the company.[21]  Regarding "major areas of focus/improvement," she wrote "[d]uring the next year, I plan to have continued growth in the area of increased technical knowledge regarding engineering and architectural technology."[22]  Although the form requested "specific performance factors you believe you should improve upon," plaintiff identified nothing else.  She concluded, however, that she met the factors that applied to her job assignment "in an above satisfactory standard."[23]

Garratt's comments on the 1995 appraisal form commended plaintiff on several aspects of her job performance, but also listed several areas needing improvement, such as: refraining from discussing internal personnel problems with clients; reporting any unpleasant incidents factually and candidly; maintaining a pleasant and understanding working relationship with fellow employees; and learning not to become upset over a fellow employee's style of communication.[24]  Garratt and Charles Munden, Volkert's Regional Vice President, met with plaintiff on May 24, 1995, to discuss her first annual appraisal.[25]  During that meeting, plaintiff insisted that Garratt's comments regarding areas in which she needed improvement either were wrong, or did not apply to her.[26]

Plaintiff completed the employee portion of her 1996 appraisal form on June 5, 1996,

---

[21] *Id.*, Tab A, Exhibit 7, at unnumbered page 2.

[22] *Id.*

[23] *Id.*

[24] *Id.* at unnumbered page 3-4.

[25] Defendant's evidentiary submission (doc no. 38), Tab A, Exhibit 7, at unnumbered page 1.

[26] *Id.*, at unnumbered page 6-8; *see also* Tab A (plaintiff's Dec. 13, 2000 deposition), at 135-37.

6

identifying six projects that had been awarded to Volkert during the previous year as a result of her marketing efforts.[27]   Under the heading "major accomplishments" she wrote:  "As with any organization, my hope is to advance in tenor [sic] and professional title status which reflects my accomplishments. I desire a SENIOR MARKETING EXECUTIVE title upgrade and with continued success, I hope to be considered as an ASSISTANT VICE PRESIDENT in marketing in the future."[28]

Garratt completed the supervisor's portion of plaintiff's 1996 appraisal form on July 30, 1996, and observed that she "led or contributed significantly to [the] marketing team's effort on several successful solicitations."[29]   Garratt added, however, that plaintiff needed to intensify her marketing efforts, and to attempt to work more as a team with fellow employees.[30]  Plaintiff testified in deposition that she believed the 1996 evaluation was fair.[31]

Even so, on August 5, 1996, plaintiff asked Garratt, in passing, when they were going to discuss her employee appraisal for that year.[32]  Several days later Garratt sent plaintiff a letter reading as follows:

> In our meeting on Monday, August 5th, you made several serious, but non-specific accusations against David Volkert & Associates, Inc., and against me personally.  At that time, I asked you to specify your complaints so that I could fulfill my responsibility to resolve any problems that are within the scope of my authority.  I believe that I gave you every opportunity to do so, but no progress was made in better defining or resolving any problems.
>
> If you have any specific complaints with me or with the firm you should prepare an

---

[27] *Id.*, Tab A, Exhibit 8, at unnumbered page 1.

[28] *Id.*, at unnumbered page 3 (all cap emphasis in original).

[29] *Id.* at unnumbered page 4.

[30] *Id.*

[31] Defendant's evidentiary submission (doc. no. 38), Tab A (plaintiff's Dec. 13, 2000, deposition), at 154.

[32] *Id.* at 155-156; *see also id.*, Tab A, Exhibit 8, at unnumbered page 11.

itemized account of your grievances.  In accordance with the Personnel Practices Manual, Sections II. A.  Equal Employment Opportunity and II. K, Grievances, it will be necessary for you to contact Margaret Hancken in the Mobile office to initiate a formal complaint.[33]

Upon receipt of Garratt's letter, plaintiff wrote back, stating:

In response to your letter dated August 9th 1996, regarding a meeting that we had on August 5th, the first paragraph of the attached letter is not an accurate account of that meeting, nor our discussion.

We simply had a discussion about my annual review and its completion.  I asked about my review because I was asked to fill out paperwork in June to get the process started.  With an initial hiring month of April, I asked about it, because there has been no mention of it since June.

My hope is that this letter is not an example of an unwillingness to sit and discuss reasonable personnel matters.  I am willing to do so and my hope is that you are willing to do so as well.

My sincere commitment is to perform the duties that have been assigned to me as a Marketing Executive.  I believe I am fulfilling these duties as demonstrated by the list of projects on my 96 appraisal form.  As always, my focus has been and will continue to be on our talents and on our clients.[34]

On June 2, 1997, plaintiff submitted a memorandum to Garratt contending that her job title should be changed to reflect her position relative to comparable "associates throughout the local area" at other businesses.[35]  She attached a list of the members of the Alabama Society of Marketing Professional Services, which included numerous titles of employees from other businesses.  In fact, the list included plaintiff, who was identified as "Chief Marketing Executive" for Volkert.[36]  Nevertheless, plaintiff contended that her title should be changed, either to Director of Marketing

---

[33] *Id.*, Exhibit 8, at unnumbered page 11.

[34] *Id.*, at unnumbered page 13.

[35] *Id.*, Exhibit 10, at unnumbered page 1.

[36] *Id.*, at unnumbered page 2-8.

or Marketing Director, to adequately identify her position relative to her peers at other firms.[37] At some point in 1996, plaintiff's title was changed from Marketing Executive to Marketing Manager, even though plaintiff does not act in a managerial or supervisory capacity.[38]

On her 1997 appraisal form, rather than noting areas in which her work could be improved, plaintiff stated that Volkert should allow her an "opportunity to demonstrate leadership [by] participating in an introductory role during oral presentations when the firm is short listed by clients that [she] played a major role in marketing."[39] She also stated that one of her immediate goals was "to receive a fair and equitable appraisal review, which will result in a tangible salary increase that reflects my contribution to the marketing team."[40]

Garratt completed the immediate supervisor's portion of plaintiff's third annual appraisal on July 21, 1997.[41] He stated that plaintiff had "led or contributed to Volkert's marketing effort on significant projects during the past year, resulting in" several contracts for the company.[42] Even so, Garratt also encouraged plaintiff to focus more on major projects, and to continue to expand regional marketing efforts.[43] Plaintiff described this appraisal as the best she had received since beginning her employment with Volkert.[44]

At some point in 1997, plaintiff obtained a document that listed the compensation of Volkert

---

[37] Defendant's evidentiary submission (doc. no. 38), Tab A, Exhibit 10, at unnumbered page 1.

[38] *Id.*, Tab G, at unnumbered page 4; *see also id.*, Tab B, at 39.

[39] *Id.*, Tab A, Exhibit 10, at unnumbered page 9.

[40] *Id.* at unnumbered page 11.

[41] *Id.* at unnumbered page 12.

[42] *Id.*

[43] Defendant's evidentiary submission (doc. no. 38), Tab A, Exhibit 10, at unnumbered page 12.

[44] *Id.*, Tab A (plaintiff's Dec. 13, 2000, deposition), at 196.

executives, including Garratt and Keith King, Chairman of the Board and Chief Executive Officer.[45] She received the document from Anthony James, an employee in Volkert's Mobile office who recovered it from the trash.[46] Plaintiff kept a copy of this document, because she believed that it evidenced racial discrimination at Volkert.[47] Plaintiff sent a letter to Garratt on April 17, 1998, requesting both a promotion and pay raise, saying:

> With the review of the attached listing of the Engineering Marketing Achievements, please allow this letter to serve as a request for consideration for an improved compensation plan. My performance over the past years, particularly last year is the primary basis for this request and because there has been no consideration to share in any year end bonus opportunity.
>
> I would like to ask for consideration that my salary be increased by $10,000 annually to $64,000, as well as, a title change to assistant vice-president.
>
> A title change for one in my position, is a benefit to the company. Clients respond favorably and know that they are being called on by an associate of the firm that really represents the company from an executive level. Many of the clients that I am responsible for calling on acknowledge the sign of success and accomplishment that would come with a representative title change.
>
> If necessary, I would like an opportunity, to discuss other reasons why I believe these changes are merited before a final decision is made. Thank you.[48]

Garratt responded to plaintiff's request with the following letter, written on June 8, 1998:

> Attached to this letter is your Employee Appraisal Form for your performance over the past year. While noting your accomplishments, it also identifies major areas in which you need to focus and improve your performance. Those observations are self explanatory, but I want to emphasize through this letter the necessity of your improving in those areas. Most importantly, you must work better as a member of the Volkert "team". This includes being more cooperative with others and sharing relevant information in a timely and factual manner. Also, while you have made significant contributions to several successful marketing efforts, those

---

[45] *Id.* at 160-62; *see also*, Tab A, Exhibit 9.

[46] *Id.*, Tab A (plaintiff's Dec. 13, 2000, deposition), at 161.

[47] *Id.* at 164.

[48] Defendant's evidentiary submission (doc. no. 38), Tab A, Exhibit 16.

accomplishments were not solely attributable to you, and your claiming sole credit is counterproductive to our efforts to work together as a team.

As indicated in the appraisal, I am asking once more that you make specific changes in your approach to marketing the services of this firm, and in your work habits. I am also insisting that you follow the guidance of Volkert's officers in conducting your work.

Your request for an increased salary and promotion is denied at this time. I will complete a follow-up appraisal after a period of approximately two months. At that time, I will re-examine your progress in the "areas of improvement" section of your appraisal. I will also reconsider whether a salary increase is appropriate or, conversely, whether I should recommend termination of your employment with Volkert. I certainly hope you will take this appraisal to heart, so that my recommendation can be the former, rather than the latter.[49]

In the appraisal itself, Garratt acknowledged plaintiff's accomplishments, stating that she

"made significant contributions to several successful solicitations, notably <u>Visionland (March 97)</u>

<u>and [Birmingham] Airport Infield Service Road (July 97)</u>. However, she incorrectly maintains that

she is solely responsible for the firm's success on certain solicitations, and fails to acknowledge the

contributions of other team members."[50] Concerning "major areas of focus/improvement," Garratt

listed the following items:

1.   With Visionland and other major projects completed or well underway, Jacqueline should concentrate on identifying new clients/projects rather than focusing on existing projects where additional opportunities are limited. Focus on Zoo/Decatur.

2.   Become a better team member. Discontinue claims that successes are based solely on Jacqueline's relationship with certain clients. Recognize the contributions of others.

3.   Consistent with (1) & (2), cooperate with others and share relevant information with team members in a timely and factual manner.

---

[49] *Id.*, Tab A, Exhibit 17.

[50] *Id.*, Tab A, Exhibit 11, at unnumbered page 3 (underlined emphasis in original).

11

4.      Accept the guidance of Volkert's officers before making marketing calls and follow instructions/guidance received.

5.      Submit a detailed weekly itinerary and update it when changes occur. Keep regular office hours when not calling on clients or conducting other Volkert business.

A follow-up appraisal will be conducted in approximately two months.[51]

Plaintiff responded to Garratt's comments in writing, saying:

Listed below are agreed upon Solutions to address the Identified Areas of Improvement discussed during the last meeting pertaining to my Appraisal on June 16, 1998.

1.      We agreed to continue to focus on identifying new clients, as demonstrated with a current list of potential new projects .... Also, we agreed that there are additional opportunities surrounding the Visionland project, i.e, Aquarium Project, Retail developments, and surrounding area school development projects. Phil identified two specific clients that he wanted marketed, the Birmingham Zoo Expansion, and the City of Decatur for Engineering opportunities.

2.      We discussed and agreed upon things that communicate a better TEAM atmosphere among colleagues. To become more inclusive, rather that [sic] exclusive can only enhance a TEAM atmosphere.

3.      We discussed and agreed that sharing information as it regards to feedback is very important and sharing information in a verbatim manner is done only to facilitate a means to enhance our presentation to clients in an effort to achieve good customer satisfaction. Always keeping in mind, that using tact is appropriate.

4.      With regard to the comment of accepting guidance, Phil has requested input in planning an itinerary with regard to Marketing Calls. We agreed that I do have the freedom to call on all clients where I know there is potential for future business.

5.      As always, I have and will continue to submit a weekly itinerary as I have done every [sic] since the policy has been implemented in the Birmingham Office. Also, as I have always done, I keep regular office hours and I readily

---

[51] *Id.* at 3-4.

12

work over the 40 hour work week often whenever necessary to maintain and cultivate good Marketing contacts and support.[52]

Garratt conducted his follow-up appraisal of plaintiff's performance on August 31, 1998,[53] and drafted a letter stating that he "had seen no substantive improvements."[54] This letter extended her probation period "for no longer than four months," and stated that, if her performance did not improve within that time, he would have "no choice but to recommend termination of [her] employment with Volkert."[55] However, Garratt did increase plaintiff's annual salary by $2,046, to cover cost of living adjustments; and he added that, should her performance improve, an additional merit increase would be considered.[56]

The following day, Garratt went to plaintiff's office to deliver and discuss his follow-up appraisal.[57] Plaintiff testified that Garratt was "so agitated once the door was shut and almost to the degree that I felt that he would attempt to harm me in some way."[58] During this meeting, plaintiff interrupted Garratt, saying that she was entitled to have a representative present and that she wanted the receptionist to sit in on the meeting for her protection.[59] Plaintiff's recollection of this meeting differs significantly from the detailed description recorded by Garratt in a memorandum to plaintiff's personnel file, reading as follows:

> I met with Jacqueline Franklin in her office at 10:00 a.m. this morning to attempt to conduct the attached follow-up (to her June 8th) appraisal. I began by explaining the

---

[52] *Id.*, Exhibit 12.

[53] *Id.*, Tab A, Exhibit 13, at unnumbered page 3.

[54] Defendant's evidentiary submission (doc. no. 38), Tab A, Exhibit 18.

[55] *Id.*

[56] *Id.*

[57] *Id.*, Tab A, Exhibit 14; *see also id.*, Tab A (plaintiff's Dec. 13, 2000, deposition), at 223-24.

[58] *Id.*, Tab A (plaintiff's Dec. 13, 2000, deposition), at 224-25.

[59] *Id.*

contents of my August 31st letter (also attached) and how I planned to discuss each part of the appraisal in detail. I then gave her the letter and appraisal form, which she did not look at initially.

She seemed very irritated and said that she had met with Mr. King in June and felt that he had agreed with her philosophy that Marketing is based on relationships and that she is a professional, competent marketer. She continued at some length about her views on this subject. At the first opportunity to speak, I replied that, while I do not disagree that she is competent, I do disagree with her approach to Marketing. (It was difficult to continue even at this point, because she interrupted to claim that I had said she was incompetent). I continued that she seemed to be saying that she still disagreed with my earlier appraisal and that it is important for her to allow me to proceed and to consider my appraisal if progress is to be made.

Jacqueline continuously interrupted me and became quite angry. She pointed to the letter on her desk and said "there is nothing factual in here!" I calmly pointed out that Jacqueline had not yet read the appraisal and that discussing its specifics was my intention, but that her interruptions were making that very difficult. She then turned for the first time to the appraisal form, read the first two lines, laughed, and began loudly disputing the first item. I explained that I was not willing to argue with her.

As I tried to begin discussing the appraisal itself, Jacqueline again interrupted, saying that she was entitled to have a representative present and that she wanted our receptionist to come in "for her protection". I said that would not be appropriate. Jacqueline then claimed that she was afraid of me because I was being confrontational and obviously had bad intentions. At that point, I re-opened her office door (which Jacqueline had asked me to open when the meeting began, but then insisted on closing herself after I had agreed and opened the door). Jacqueline then tried to call the receptionist, who did not answer. She tried to make several more calls in spite of my request that she stop and listen for a moment. She finally reached Mr. Faulkner and had a brief conversation with him, generally complaining that I was mistreating her and asking how she should proceed. When she hung up, I told Jacqueline that I could not complete her appraisal at that time.

I told her that I would be unable to resolve her complaint (also made in June) of being afraid of me, and I advised her to make a formal complaint in accordance with the firm's grievance policy. I suggested that her complaint could be initiated by a phone call to Margaret Hancken, and that she should not put it off. Jacqueline said that Mr. Faulkner had told her to go ahead with the meeting with her representative present and then make her complaint afterward. I said again that having our receptionist to sit in would be inappropriate because this is a confidential personnel matter. Jacqueline became very angry and said, "there is nothing going on that they don't already know!" I asked Jacqueline how others would know about her

14

probation. She hesitated, then said "because of your body language!"

I repeated that the appraisal could not be continued, but that she needs to make her complaint of being afraid of me to Mobile. I added that her refusal to come to my office since June 8th and her reaction to her appraisal today was creating a serious communication barrier which needs to be addressed. Jacqueline responded "You don't want to come to my office? It sounds to me like you're the one with the problem." I calmly said that I was in her office and that I had been in her office many times. As I was leaving, Jacqueline said she was agreeable to proceeding to discuss the appraisal with the receptionist. I declined and left.[60]

As the "communication barrier" between Garratt and plaintiff continued to grow, Garratt began keeping Keith King, Volkert's Chief Executive Officer, and Charles Munden, the Regional Vice President, informed of the situation. King addressed plaintiff directly on October 1, 1998.[61] He telephoned her on that date and, according to plaintiff, asked: "Do you know who you work for? I called to let you know who you work for."[62] (King explained that she worked for her supervisor, Phillip Garratt.[63]) Plaintiff responded by saying that she believed she was being discriminated against because of her race and gender.[64] This was the first time that plaintiff complained of discrimination to any management official at Volkert.[65]

On October 16, 1998, King traveled from his office in Mobile to Birmingham, in an attempt to mediate the differences between plaintiff and Garratt.[66] King conducted separate meetings with plaintiff and Garratt.[67] During his meeting with plaintiff, King told her: "It's time for you to

---

[60] Defendant's evidentiary submission (doc. no. 38), Tab A, Exhibit 14.

[61] Plaintiff's evidentiary submission (doc. no. 43), Tab 2, at 242-264.

[62] Defendant's evidentiary submission (doc. no. 38), Tab A (plaintiff's July 5, 2001, deposition), at 20.

[63] Id.

[64] Id. at 21.

[65] Id. at 24, 27.

[66] Plaintiff's evidentiary submission (doc. no. 43), Tab 2, at 245; see also id., Tab A (plaintiff's July 5, 2001, deposition), at 30.

[67] Id.

15

leave."[68]  He said that Garratt "has a family," and that "he felt that it would be better if [plaintiff] would leave."  King also told plaintiff to file an internal grievance with regard to her complaints of discrimination.[69]  She subsequently did so.[70]

After hearing plaintiff's complaint, King contacted Thomas Zoghby, Volkert's Chief Financial Officer and EEO Coordinator, and instructed him to initiate a formal grievance investigation regarding the concerns raised by plaintiff.[71]  Zoghby contacted plaintiff by letter dated November 13, 1998, and requested that she submit a written grievance before November 25, 1998, detailing her complaints.[72]  He informed plaintiff that, once her grievance was received, "we will conduct the appropriate interviews and make a determination, of which you will be informed."[73]

Plaintiff submitted a four-page grievance on November 23, 1998, detailing her "list of concerns" regarding "gender and race discrimination which has included continuous and blatant difference in treatment, in comparison to my white male and female counterparts within the firm by Mr. Garratt and others."[74]  Specifically, she complained about:  (1) Garratt's timeliness in conducting her annual performance appraisals;[75]  (2) Garratt's failure to adequately discuss her appraisals;[76]  (3) Garratt's handling of her request for an improved compensation plan and

---

[68] Defendant's evidentiary submission (doc. no. 43), Tab A (plaintiff's July 5, 2001, deposition) at 43.

[69] Plaintiff's evidentiary submission (doc. no. 43), Tab 2, at 261-264.

[70] Defendant's evidentiary submission(doc. no. 38), Tab A (plaintiff's Dec. 13, 2000, deposition), at 338.

[71] *Id.*, Tab A, Exhibit 25; *see also,* Plaintiff's evidentiary submission, Exhibit 2, at 263.

[72] *Id.*, Tab A, Exhibit 25.

[73] *Id.*

[74] *Id.*, Tab A, Exhibit 26, at unnumbered page 1.

[75] *Id.*

[76] Defendant's evidentiary submission (doc. no. 38), Tab A, Exhibit 26, at unnumbered page 1.

promotion;[77] (4) Garratt's interacting with plaintiff in a manner different from other employees;[78] and (5) her general alienation from the corporate marketing hierarchy.[79]

King wrote plaintiff on December 9, 1998, informing her that her grievance would be handled by a committee consisting of Clifton E. Lambert (Chairman), James Faulkner, and Margaret Hancken.[80]

On December 31, 1999, Garratt informed plaintiff in writing that he considered her 1998 appraisal to be complete.[81]  He stated that, even though he was "not recommending any additional salary increase or change in title at this time," he was "no longer considering a recommendation for dismissal either."[82]  He added that he was "committed to continuing to work with [her] to resolve [their] differences."[83]

The grievance committee met on March 10, 1999, to discuss the final disposition of plaintiff's grievance.[84]  "After agreeing that there was enough information to make an informed decision and final judgment, the Committee proceeded to discuss the issues and their impact on whether there was gender and/or racial discrimination by the accused against the grievant."[85]  The committee issued its findings in April of 1999, identifying five areas of contention raised by plaintiff: (1) appraisal process; (2) performance reviews; (3) pay increases and advancements; (4)

---

[77] *Id.* at unnumbered page 2.

[78] *Id.* at unnumbered page 3.

[79] *Id.* at unnumbered page 4.

[80] *Id.*,Tab A, Exhibit 28.

[81] *Id.*, Tab A, Exhibit 29.

[82] Defendant's evidentiary submission (doc. no. 38), Tab A, Exhibit 29.

[83] *Id.*

[84] *Id.*, Tab A, Exhibit 38, at unnumbered page 1.

[85] *Id.*

performance, achievements, and bonuses; and (5) differential treatment.[86] The committee concluded that plaintiff was not discriminated against on the basis of race or gender.[87]  However, Clifton Lambert, the committee's chairman (and only black member), dissented as to the committee's finding that there was no racial discrimination.[88]  Lambert's dissenting opinion states in pertinent part:

> Racial discrimination was inferred because the accused [Phillip Garratt] failed to satisfy that [sic] Committee Member that he was not racially motivated.  The hiring of other minorities and women does not substantiate equitable treatment of the grievant in this matter.  This is a case specific situation where actions by the accused were not just and equitable.   The hiring of employees may be related to the fulfillment of the company policy rather than a concerted effort to diligently hire and retrain minorities and females in the Birmingham office.

> On the other hand, the accused handling of the situation does not infer that he is racist or that he discriminated simply on the grounds he failed to provide an adequate explanation for his conflicting actions.   His preparedness, presentation and documentation were not sufficient to substantially convince this Committee Member that his actions were not racially motivated.

> The conflicting information and resulting actions of the accused lead the one opposing Member to conclude that racial discrimination existed in motive by the direct actions of the accused.  In most cases involving performance reviews, the grievant would be told that she was not a team player, would not follow orders, etc., but evidence shows that such statements were not substantiated in the recorded performance reviews. ... Performance achievements have been denied by the accused, yet documentation and Committee questioning revealed that marketing results have been achieved by the grievant whether singularly or as a team member. Many of the reasons or rational[e] for denial of advancement was based on direct subjective judgment and not facts as related to performance.  Many examples can be pointed out, but the opinion of this Committee Member is that direct actions have been exhibited by the accused that were racially motivated and discriminatory.  Other employees, whether white males or females to this members knowledge, have not

---

[86] *Id*. at unnumbered page 1-3.

[87] *Id*. at unnumbered page 3.

[88] Defendant's evidentiary submission (doc. no. 38), Tab A, Exhibit 38, at unnumbered page 3; *see also* Plaintiff's evidentiary submission (doc. no. 43), Tab 4, Exhibit 2.

been treated in a similar manner.[89]

On April 28, 1999, King notified plaintiff in writing that he had accepted the committee's findings that she was not discriminated against on the basis of race or gender.[90] This was plaintiff's first notice of the grievance committee's decision.[91] Shortly thereafter, King offered plaintiff the opportunity to meet and review the committee's findings. She declined.[92]

Plaintiff alleges that Garratt continued to discriminate against her following the filing of her internal grievance. She alleges that Garratt made her job more difficult by requesting that she "produce results hurriedly," and that he generally created an "environment of intimidation."[93] Plaintiff further alleges that Garratt began to reassign to white employees projects that previously had been assigned to her.[94]

> For example, in April 1998, Mr. Garratt changed the marketing minutes to reflect that Mark Dolan was primarily responsible for the Jefferson County Environmental Services marketing, when this had previously been listed on the minutes as my primary responsibility. Even after this change in designation, though, my relationship and contacts with Jefferson County Environmental Services did not change. Similarly, though the Air Cargo Expansion Project for the Birmingham Airport Authority is my primary responsibility, Mr. Garratt asks Alicia Rudolph, a white female, to report on this project during marketing meetings. Ms. Rudolph was promoted to Assistant Vice President in the summer of 2001. Mr. Garratt's attempts to diminish the apparent level of contribution I made the company have and will continue to adversely affect how Volkert views my productivity.[95]

Plaintiff filed a charge a racial and gender discrimination with the Equal Employment

---

[89] *Id.*, Tab 4, Exhibit 2.

[90] *Id.*, Tab A, Exhibit 31.

[91] *Id.*, Tab A (plaintiff's Dec. 13, 2000, deposition), at 351-52.

[92] *Id.* at 353.

[93] *Id.* at 395.

[94] Plaintiff's evidentiary submission (doc. no. 43), Tab 5, ¶ 13.

[95] *Id.*

Opportunity Commission on April 15, 1999. Her charge stated:

> On or about April 15, 1999, and continuing, the employer has subjected me to a work environment that was hostile, offensive and intimidating to me because of my race and gender. On April 8, 1998, the employer gave me an unlawful performance evaluation. On June 8, 1998, the employer denied me a promotional upgrade to a position of Vice President of Marketing. I was also denied a merit increase on June 8, 1998. The employer has also retaliated against me because I, on November 23, 1998, protested activities I believed to be unlawful under the statutes, in that I filed an internal grievance as instructed. I am currently employed as a Marketing Manager of the Birmingham location.
>
> I was supervised by Phillip Garratt, White male Vice President, Birmingham, and Keith King, White male CEO. The employer provided no legitimate reason for the actions taken against me.
>
> I believe I was discriminated against in violation of Title VII of the 1964 Civil Rights Act, as amended, because of my race, Black and gender female. I contend that I am the only Black female marketing manger employed in the entire company. Subsequent to my protest, the employer's attitude and communication was different than that shown other managers. Such interaction was essential for the performance of my duties. The employer denied me the title and wages paid my predecessor and White male managers.[96]

Plaintiff received her portion of the 1999 appraisal form on May 20, 1999.[97] She refused to complete it, because of her pending EEOC charges.[98] Garratt acknowledged the pending EEOC charges on June 10, 1999, and stated, in writing, that "I have a responsibility to evaluate your performance and I do not feel that it would be appropriate to delay it indefinitely. In fact, I believe it is important to continue to work to resolve our differences.... "[99]

Garratt again wrote plaintiff on October 14, 1999, requesting that she complete the employee comment portion of her 1999 appraisal form.[100] Plaintiff responded by letter on October 19, 1999,

---

[96] Defendant's Motion to Supplement its Evidentiary Submission (doc. no. 54), Tab 1.

[97] Defendant's evidentiary submission (doc. no. 38), Tab A, Exhibit 32.

[98] *Id.*

[99] *Id.*, Tab A, Exhibit 39.

[100] *Id.*, Tab A, Exhibit 23.

stating that she could not complete the appraisal form until the EEOC investigation process was

completed.[101]  Garratt replied by letter on October 28, 1999, saying:

> Regarding your letter of October 19, 1999, we have discussed with the EEOC your
> stated position that you will not participate in your performance appraisal while the
> EEOC investigation is ongoing.  EEOC investigator Charles Hullett has informed us
> that EEOC did not tell you to refrain from participating in the performance appraisal
> process and there is no other reason for you not to take part in the process.
>
> Your refusal to participate in the appraisal process continues to concern me.  Please
> reconsider your position and provide a response to the performance appraisal right
> away.[102]

Plaintiff responded the following day, writing that she perceived Garratt's continued effort to make

her complete the appraisal form as a continuation of his threatening and harassing treatment.[103]  She

again refused to complete the form.[104]  Garratt replied on November 4, 1999,[105] saying:

> Unfortunately, we are now communicating in writing on issues that we should be
> discussing face to face.  My request that you respond to your performance appraisal
> is not a threat or form of harassment.  It is, however, part of the routine responsibility
> of an employee at David Volkert & Associates.  You are declining, without good
> reason, to participate in your 1999 performance evaluation process.  I am not
> pressuring you to say anything other than whatever honest response you have to the
> appraisal.   Waiting until the EEOC finishes its investigation into the 1998
> performance appraisal is inappropriate, particularly when we need to work together
> to improve your performance in 1999.  We will document the fact that you "have no
> comments" concerning your 1999 appraisal unless you tell me otherwise promptly.
>
> I regret that you characterize my request that you participate in the appraisal process
> as harassment.   I simply cannot understand how you can insist that you are
> committed to achieving marketing success in the Birmingham office, while at the
> same time refusing to take part in a process the sole purpose of which is to improve
> your performance.  Your position on this issue is misguided and contrary to Volkert's
> procedures.   Even though you take this position, you are not complying with

---

[101] *Id.*

[102] *Id.*, Tab A, Exhibit 33.

[103] Defendant's evidentiary submission, Tab A, Exhibit 34.

[104] *Id.*

[105] *Id.*, Tab A, Exhibit 35.

company policies and procedures in your actions.[106]

Garratt's comments on plaintiff's 2000 appraisal are as follows:

> The Birmingham office marketing program has been successful this year, meeting & exceeding our local area goal for the first time ever.  Jacqueline has contributed to the marketing team's success on such projects as.... Jacqueline has also assisted the Architectural marketing program and continues to work on on-going solicitations such as....

Garratt further commented regarding "major areas of focus/improvement":

- Project Information — still need to be more specific in obtaining & reporting information such as scope, budget, finding source, selection process, schedule, decision makers, etc.

- Communication/Cooperation — improvement still needed in keeping team members informed and in being more cooperative/responsive to others on the solicitation team.

- Marketing Calls — revise schedule/frequency of calls to improve effectiveness & results. Some contacts don't need to be made as often.  Other [sic] may need to be more often.[107]

In 2000, plaintiff did receive a bonus in the amount of $1,300.00.[108]

> Plaintiff initiated the present action on July 3, 2000.[109]

> In 2001, plaintiff requested the opportunity to work as an independent contractor.  Volkert's

policy as to independent contract work is as follows:

> Secondary employment (moonlighting) is discouraged when the services are within the scope of work VOLKERT can or does perform.  In unusual circumstances, moonlighting may be allowed, provided approval is given in writing by the Vice President in charge of your office.

> No moonlighting may be performed on Company premises or with Company

---

[106] *Id.*

[107] *Id.*, Tab A, Exhibit 45, at unnumbered page 3.

[108] *Id.*, Tab A (plaintiff's July 5, 2001, deposition), at 182.

[109] Complaint (doc. no. 1).

facilities and equipment either during or after working hours.  No moonlighting is to be done for any client of the firm or any other employer that could represent a conflict of interest.[110]

In May of 2001, Volkert, in association with a firm referred to in plaintiff's deposition as the "Washington group," filed a competitive bid for a project with the Birmingham Regional Planning Commission.[111]  Volkert learned that it was not awarded the contract on May 22, 2001.[112]  However, a firm known as STV, Inc., left a message with plaintiff on May 25, 2001, indicating that STV was interested in having Volkert provide the "public involvement responsibility" for the project.[113]  Plaintiff received that message on May 29, 2001.[114]  That same day, she informed Garratt of the potential job; she also informed Garratt that STV needed a response as soon as possible.[115]  Plaintiff did not at any time inform Garratt that STV required a definitive response by 2:00 p.m. on May 30, 2001.[116]  Consequently, Volkert did not respond to STV by the 2:00 p.m. deadline.[117]

At approximately 2:30 p.m., STV contacted plaintiff and inquired as to whether she would consider doing the work as an independent contractor.[118]  Plaintiff responded that she would.[119]  She then notified Rodney Summerford, Volkert's Senior Vice President and Garratt's immediate supervisor, that Volkert had missed STV's 2:00 p.m. deadline, thereby losing the job opportunity;

---

[110] Defendant's evidentiary submission (doc. no. 38), Tab A, Exhibit 50, at unnumbered page 3.

[111] *Id.*, Tab A (plaintiff's July 5, 2001, deposition), at 226-228.

[112] *Id.*, Tab A (plaintiff's July 5, 2001, deposition), at 229.

[113] *Id.* at 230.

[114] *Id.*

[115] *Id.* at 231.

[116] Defendant's evidentiary submission (doc. no. 38), Tab A (plaintiff's July 5, 2001, deposition), at 237-238.

[117] *Id.* at 238.

[118] *Id.* at 238-239.

[119] *Id.* at 240.

23

however, STV was interested in having plaintiff do the work as an independent contractor.[120] During

his conversation with plaintiff, Summerford indicated that there might be a conflict of interest if she

were to independently contract with STV.[121]  In support of her request for moonlighting approval,

plaintiff notified Summerford, in writing, that she informed STV that the job would require

approximately 590 man-hours.[122]  Summerford responded to plaintiff's request in writing on June

11, 2001, saying:

> We have reviewed your request for approval of secondary employment
> (moonlighting) to provide services to STV Incorporated for public involvement
> activities on the Birmingham Regional Transportation Corridor Alternative Analysis
> project.
>
> The scope of services provided to us for your involvement does not fall within the
> requirements of our corporate Personnel Policy manual for the following reasons:
>
> 1)    Moonlighting is discouraged when the services are within the scope of work
>       Volkert can or does perform.
>
> 2)    No moonlighting is to be done for any client of the firm or any other
>       employer that could represent a conflict of interest.
>
> 3)    Discussions with representatives of STV Incorporated revealed they expect
>       some of the services required will have to be performed during you normal
>       work hours for Volkert.[123]
>
> For these reasons, we cannot approve your request.

## II. DISCUSSION

A.    **Plaintiff's Claims of Disparate Treatment Based Upon Her Race and Gender in
      Violation of Title VII**

A plaintiff must satisfy a number of administrative prerequisites before filing a suit based

---

[120] *Id.* at 244-245.

[121] *Id.* at 270.

[122] Defendant's evidentiary submission (doc. no. 38), Tab A, Exhibit 50, at unnumbered page 5.

[123] *Id.* at unnumbered page 7.

upon Title VII.  Foremost among these is the requirement that a charge of discrimination be submitted to the Equal Employment Opportunity Commission within 180 days "after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1); *see also, e.g., Alexander v. Fulton County*, 207 F.3d 1303, 1332 (11th Cir. 2000) ("No action alleging a violation of Title VII may be brought unless the alleged discrimination has been made the subject of a timely-filed EEOC charge.").

"[T]he purpose of the charge of discrimination is to trigger the investigatory and conciliatory procedures of the EEOC." *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970).[124] This prerequisite reflects a congressional intent to encourage voluntary compliance and conciliation, rather than litigation, as the "preferred means" of "eliminating those practices and devices that discriminate on the basis of race, color, religion, sex, or national origin." *Alexander v. Gardner-Denver Company*, 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974); *see also Sims v. Trus Joist MacMillan*, 22 F.3d 1059, 1063 (11th Cir. 1994) ("Congress clearly intended for the EEOC and the complaining party to attempt a reconciliation of the charge of discrimination before proceeding to federal court, and thus it imposed a time limit during which this reconciliation should occur....").

If a plaintiff fails to file a charge within this 180 day window, her claim may be procedurally

---

[124] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981. *See also Virgo v. Riviera Beach Associates, Ltd.*, 30 F.3d 1350, 1358 (11th Cir. 1994), where the Eleventh Circuit observed:

Generally speaking, the EEOC is charged with the task of investigating allegations of civil discrimination and harassment in the employment context and determining whether there is any reason to believe the allegations are true. Under 42 U.S.C. § 2000e-5, a person who wants to file a lawsuit under Title VII must first file a charge with the Equal Employment Opportunity Commission alleging a Title VII violation and exhaust all remedies provided by the EEOC. If the conciliation efforts are unsuccessful, the EEOC will inform the parties and issue a letter authorizing the complainant to file a Title VII suit.

barred for untimeliness. *See Delaware State College v. Ricks*, 449 U.S. 250, 256, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980); *Everett v. Cobb County Sch. Dist.*, 138 F.3d 1407, 1410 (11th Cir. 1998).

Although administrative exhaustion "is not a jurisdictional prerequisite to suit in federal court," *Zipes v. Trans World Airlines*, 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982), it is a condition precedent to the maintenance of an action upon which plaintiff bears the burden of proof.[125] Even so, this procedural requirement still is "subject to waiver, estoppel, and equitable tolling." *Id; see also Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1531 (11th Cir. 1992) ("The requirement of timely filing a charge with the EEOC is not jurisdictional; rather, it is a statutory limitation that is subject to equitable tolling."). "Precedent in this circuit and the former Fifth Circuit has established that the limitations period is tolled 'until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for [her] rights.'" *Miranda*, 975 F.2d at 1531 (quoting *Cocke v. Merrill Lynch & Co.*, 817 F.2d 1559 (11th Cir. 1987)).

Before a district court may assess the timeliness of a plaintiff's EEOC charge, it must "identify precisely the 'unlawful employment practice' of which he complains." *Delaware State College v. Ricks*, 449 U.S. at 257, 101 S. Ct. at 503.

In the present case, Volkert denies that plaintiff filed her EEOC complaint within 180 days

---

[125] *See Jackson v. Seaboard Coast Line Railroad Company*, 678 F.2d 992, 1010 (11th Cir. 1982), holding that

a plaintiff must generally allege in his complaint that "all conditions precedent to the institution of the lawsuit have been fulfilled." ... If the defendant doubts the veracity of plaintiff's allegation, in whole or in part, then the defendant may deny "specifically and with particularity" that the preconditions have not been fulfilled. ... The plaintiff then bears the burden of proving that the conditions precedent, which the defendant has specifically joined in issue, have been satisfied. [Citation omitted.]

from the occurrence of the alleged discriminatory act.[126]  Volkert asserts that the last alleged discriminatory act occurred on August 31, 1998, the date on which Garratt informed plaintiff that she would not receive a merit pay increase.[127]

Although plaintiff mistakenly claims that "the defendant has not raised any limitations defense in the present case," she does assert, in reliance on *Miller v. Beneficial Management Corp.*, 977 F. 2d 834 (3rd Cir. 1992), that "the appropriate time frame for investigating [her] claims extends to the present, as she has still not been promoted to Assistant Vice President or been given the raise she requested."[128]  In *Miller*, the Third Circuit found that the employer's failure to pay the plaintiff a salary equal to that of her male counterparts constituted a continuing violation under Title VII. *Id.* at 844.  Assuming for the sake of discussion that plaintiff's claim of disparate treatment with regard to salary and promotion constitutes a continuing violation of Title VII,[129] plaintiff's claim, nevertheless, is untimely due to her failure to file her claim in this court within 90 days after receipt of the EEOC's notice of right to sue.

"Under Title VII, in cases where the EEOC does not file suit or obtain a conciliation agreement, the EEOC 'shall so notify the person aggrieved and within 90 days after the giving of such notice a civil action may be brought against the respondent named in the charge ... by the person claiming to be aggrieved....'" *Zillyette v. Capital One Financial Corp.*, 179 F.3d 1337, 1339 (11th Cir. 1999) (quoting 42 U.S.C. § 2000e-5(f)(1)).

Volkert alleges that "[o]n March 31, 2000, [the] EEOC was 'unable to conclude that the

---

[126] Defendant's Brief in Support of Motion for Summary Judgment (doc. no. 39), at 32.

[127] *Id.* at 31; *see also* Defendant's evidentiary submission (doc. no. 38), Exhibit 13.

[128] Plaintiff's Brief in Opposition to Motion for Summary Judgment (doc. no. 48), at 16, n.2.

[129] *See, e.g., Carter v. West Publishing Company*, 225 F.3d 1258, 1264 (11th Cir. 2000).

information obtained establishes violations of the statute...' and issued plaintiff the right to sue within ninety (90) days from her receipt of the notice."[130]  Plaintiff neither alleges nor offers proof of when she actually received notice of her right to sue.  Moreover, she has not responded to Volkert's assertion that she filed her complaint outside the ninety day limitation period.  Plaintiff also fails to assert any reason as to why the ninety day limitation period should be equitably tolled in this instance.

In opposing a motion for summary judgment, "a party may not rely on his pleadings to avoid judgment against him." *Ryan v. International Union of Operating Engineers, Local 675*, 794 F.2d 641, 643 (11th Cir. 1986).  There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  *See Blue Cross & Blue Shield v. Weitz*, 913 F. 2d 1544, 1550 (11th Cir. 1990).  "Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).  Therefore, this court finds that plaintiff's Title VII claims are barred.

## B.    Plaintiff's Claims of Disparate Treatment Based Upon Her Race in Violation of § 1981

### 1.    Administrative prerequisites

42 U.S.C. § 1981 is narrower than Title VII; it prohibits discrimination on the basis of *race* in the making or enforcement of contracts. *See, e.g., Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459-60, 95 S. Ct. 1716, 1720, 44 L. Ed. 2d 295 (1975) ("§ 1981 affords a federal remedy against discrimination in private employment on the basis of race."); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 436, 88 S. Ct. 2186, 2201, 20 L. Ed. 2d 1189 (1968) ("In light of the concerns that led

---

[130] Defendant's Motion for Complete or Partial Summary Judgment at 2.

Congress to adopt it and the content of the debates that preceded its passage, it is clear that the Act was designed to do just what its terms suggest: to prohibit all racial discrimination, whether or not under color of law...."); *Little v. United Technologies*, 103 F.3d 956, 961 (11th Cir. 1997) ("It is well-established that § 1981 is concerned with *racial* discrimination in the making and enforcement of contracts.") (emphasis in original) (citations omitted).

Section 1981 generally is described as "a parallel remedy against [racial] discrimination which may derive its legal principles from Title VII." *Crawford v. Western Electric Co., Inc.*, 614 F.2d 1300, 1315 n.27 (5th Cir. 1980) (quoting *Blum v. Gulf Oil Corp.*, 597 F.2d 936 (5th Cir. 1979)). "When section 1981 is used as a parallel basis for relief with ... Title VII against disparate treatment in employment, its elements appear to be identical...." *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980) (citations omitted); *see also Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("Both of these statutes have the same requirements of proof and use the same analytical framework, therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well.").

However, § 1981 differs from Title VII to the extent that there are no administrative prerequisites to filing a claim based on § 1981. Neither the filing of an EEOC charge of discrimination within 180 days of the alleged unlawful employment practice as required by Title VII, *see* 42 U.S.C. § 2000e-5(e), nor "resort to Title VII's administrative machinery are ... prerequisites for the institution of a § 1981 claim." *Johnson v. Railway Express Agency,* 421 U.S. at 460, 95 S. Ct. at 1720. Therefore, plaintiff's failure to establish that she filed her claim within ninety days of receipt of notice of right to sue does not affect her claims under § 1981.

Even so, plaintiff must still file her cause of action within the applicable statute of limitations

for § 1981. And in that regard it is well settled that § 1981, like 42 U.S.C. §§ 1982 and 1983, does not contain a statute of limitations. As a result, the Supreme Court instructs district courts to "select the most appropriate or analogous state statute of limitations" *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660, 107 S.Ct. 2617, 2620, 96 L.Ed.2d 572 (1987). In Alabama, that limitations period is two years. *See Peterson v. BMI Refractories*, 132 F.3d 1405, 1414 n.16 (11th Cir. 1998) (citing Alabama Code § 6-2-38(1) (1975) for the proposition that § 1981 claims arising out of acts occurring in Alabama are governed by the state's general, two-year limitations period); *see also Goodman*, 482 U.S. at 661-664, 107 S.Ct. at 2620-2622 (holding that the court of appeals correctly applied Pennsylvania's two year statute of limitations for personal injury actions to § 1981 claims).

Plaintiff filed her complaint on July 3, 2000, alleging that the first instance of discrimination against her occurred during April of 1998. In her deposition, plaintiff states that she first recognized that she was being treated in a disparate manner in 1996.[131] In either case, plaintiff filed her claim beyond the two year statute of limitations. Therefore, her claim under § 1981 is barred as to any incident occurring outside the two year limitations period, unless she can show that Volkert's violations were part of a "continuing violation," as opposed to discrete instances of discriminatory conduct. As the former Fifth Circuit explained in *Gonzalez v. Firestone Tire & Rubber Co.*, 610 F.2d 241 (5th Cir. 1980),

> [a] past act of discrimination for which a party did not file a charge of discrimination with the EEOC within the limitations period is legally equivalent to a discriminatory act that occurred before the enactment of Title VII. Although such a past discriminatory act may continue to effect an employee's present pay and fringe benefits, such an effect does not constitute a continuing violation of Title VII. ... "[T]he critical question is whether any present violation exists." ...

---

[131] Defendant's evidentiary submission (doc. no 38), Tab A (plaintiff's Dec. 13, 2000, deposition), at 117.

...

>Where an employee charges an employer with continuously maintaining an illegal employment practice, he may file a valid charge of discrimination based upon that illegal practice until 180 days after the last occurrence of an instance of that practice. ... However, where the employer engaged in a discrete act of discrimination more than 180 days prior to the filing of a charge with the EEOC by the employee, allegations that the discriminatory act continues to adversely affect the employee or that the employer presently refuses to rectify its past violation will not satisfy the requirement of 42 U.S.C. s 2000e-5(e) that the plaintiff file his charge of discrimination within 180 days of the discriminatory act. ...

*Id.* at 249 (citations omitted); *see also, e.g., Waltman v. International Paper Co.*, 875 F.2d 468 (5th Cir. 1989); *Malone v. K-Mart Corp.*, 51 F. Supp. 2d 1287 (M.D. Ala. 1999).

>Although "the precise contours and theoretical bases of [the theory of 'continuing violation'] are at best unclear," ... there is general agreement that it relieves a plaintiff of the burden that all actionable conduct must have occurred within 180 days prior to the charge, so long as the complaint is timely as to the last occurrence. *Id.*;....

*Coon v. Georgia Pacific Corp.*, 829 F.2d 1563, 1570 (11th Cir. 1987) (citations omitted) (alteration in original).

Case law on the subject unquestionably "'is inconsistent and confusing.'" *Berry v. Board of Supervisors of L.S.U.*, 715 F.2d 971, 979 n.11 (5th Cir. 1983) (quoting *Dumas v. Town of Mount Vernon*, 612 F.2d 974, 977 (5th Cir. 1980)). "Courts have not formulated a clear standard for determining when alleged discriminatory acts are related closely enough to constitute a continuing violation and when they are merely discrete, isolated, and completed acts which must be regarded as individual violations." *Berry*, 715 F.2d at 981 (citations omitted).

The Fifth Circuit nevertheless assayed a test in *Berry*, saying that at least three, fact-specific factors are relevant when attempting to determine whether alleged discriminatory acts are sufficiently related to be deemed a continuing violation.

31

> The first is subject matter.  Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation?  The second is frequency.  Are the alleged acts recurring (*e.g.*, a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision?  The third factor, perhaps of most importance, is degree of permanence.  Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?

*Id.* (footnote omitted).

The Eleventh Circuit addressed the continuing violation doctrine in *Roberts v. Gadsden Memorial Hospital*, 835 F.2d 793 (11th Cir. 1988) ("*Roberts I*"), and purported to adopt the *Berry* test.  The plaintiff in *Roberts I* alleged that his employer had discriminated against him by denying him fair promotional opportunities because of his race, first in 1978, and then again during 1981.  *Id.* at 794-95.  The plaintiff did not file a charge against the defendant until 1981, however, which called into question the timeliness of his claim based upon the 1978 event.  *Id.*  The Eleventh Circuit addressed the plaintiff's assertion that the earlier claim still could be asserted under the continuing violation doctrine in the following manner:

> The continuing violation doctrine does not exist to give a second chance to an employee who allowed a legitimate Title VII claim to lapse.  It is only when a substantial nexus exists between a timely-filed claim and an otherwise time-barred claim that they may be viewed as constituting a single violation, part of which falls within the limitations period.  Moreover, the existence of such a nexus serves to alleviate the employer's burden in defending a remote managerial decision.  ...
>
> In determining the existence vel non of such a nexus, a court should not rely upon a superficial factual analysis, but rather, should refer to a variety of factors.  Such factors include whether the claims were related in subject matter, frequency, and permanence (*i.e.*, whether the act was sufficiently permanent in nature so as to "trigger an employee's awareness of and duty to assert his or her rights").  ...

*Id.* (quoting *Berry*, 715 F.2d at 981).  The court in *Roberts I* eventually found that the continuing

violation doctrine did not apply to save plaintiff's claim based upon the first denial of promotion

during 1978, saying that, while both alleged discriminatory acts involved the same subject matter

(denial of a promotion), the facts underpinning each decision were distinctly different.  Moreover,

two incidents three years apart were not deemed, under the facts presented, to be sufficiently

frequent to constitute a continuing violation.  835 F.2d at 800-01.

> Finally, as to the permanence factor, which the Fifth Circuit suggested was
> the most important of the three, Roberts admitted that he was aware of his rights in
> 1978.  He could have asserted them at that time.  GMH [the plaintiff's employer] was
> able to injure Roberts again only because he knowingly failed to exercise his rights.
> *A claim arising out of an injury which is "continuing" only because a putative
> plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress
> intended to bar by the 180-day limitation period.*

*Id.* at 801 (footnote omitted) (emphasis supplied).

Seven months after *Roberts I*, however, the Eleventh Circuit *sua sponte* granted rehearing,

and withdrew the foregoing discussion of the continuing violation doctrine.  *Roberts v. Gadsden*

*Memorial Hospital*, 850 F.2d 1549 (11th Cir. 1988) (*"Roberts II"*).  The *Roberts II* court replaced

its previous analysis with the following statements:

> Here, even if we assume that the 1978 discriminatory act continued into the statutory
> filing period, we must still conclude that Roberts' claim based on that incident is
> time-barred.  Roberts admitted that he was aware of his rights in 1978.  He could
> have asserted them at that time.  To the extent that GMH [his employer] injured him
> on a continuing basis as a result of the 1978 incident, it was only because he
> knowingly failed to exercise his rights.  *A claim arising out of an injury which is
> "continuing" only because a putative plaintiff knowingly fails to seek relief is exactly
> the sort of claim that Congress intended to bar by the 180-day limitation period.*

*Id.* at 1550 (emphasis supplied); *see also Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1311

(10th Cir. 1999) (dismissing one of plaintiff's failure to hire claims because she "was, at the very

least, on inquiry notice of the alleged discrimination as early as 1993, [and] she had a duty to assert

her rights at that time").

Thus, a plaintiff within the Eleventh Circuit who is aware of his or her federally protected civil rights, but knowingly fails to exercise those rights by submitting a charge of discrimination to the EEOC in a timely manner, may not later take advantage of the continuing violation equitable exception to the 180 day filing requirement.

To be sure, the 180 day filing requirement under Title VII, as well as the two year limitation under § 1981, should not be used to punish plaintiffs who are ignorant of their federally protected civil rights, or to bar recovery for discriminatory practices that manifest themselves only gradually and incrementally over time. A court "must distinguish between the 'present consequence of a one-time violation,' which does not extend the limitations period, and the 'continuation of the violation into the present.'" *Beavers v. American Cast Iron Pipe Company*, 975 F.2d 792, 796 (11th Cir. 1992) (citation omitted). "Where the employer engaged in a discrete act of discrimination outside the limitations period, allegations that the discriminatory act continues to adversely affect the employee or that the employer presently refuses to rectify its past violation will not satisfy the statute of limitations." *Knight v. Columbus, Ga.*, 19 F.3d 579, 580 (11th Cir. 1994).

A continuing violation may be based on either a series of related acts taken against a single individual, or the maintenance of a systemic, company-wide policy or practice of discrimination. *See Dixon v. Anderson*, 928 F.2d 212, 216 (6th Cir. 1990) (discussing two categories of continuing violations); *Jensen v. Frank*, 912 F.2d 517, 522 (1st Cir. 1990) (distinguishing between a serial and systemic violation). The First Circuit explained the two theories as follows:

> [A serial] violation is composed of a number of discriminatory acts emanating from the same discriminatory animus, each act constituting a separate wrong actionable under Title VII. ... In other words, a serial violation is "continuing" by virtue of the

34

fact that it keeps happening, ... an employee, say, is passed over several times for promotion, based on the same (actionable) animus. ...

Moreover, a serial violation, to be actionable requires the complaining party to demonstrate "that some discriminatory act transpired within the [limitation period.]" The interdicted act must constitute discrimination *as to the plaintiff*. ...

...

By contrast with a serial violation, a systemic violation need not involve an identifiable, discrete act of discrimination transpiring within the limitation period. ... A systemic violation has its roots in a discriminatory policy or practice; so long as the policy or practice itself continues into the limitation period, a challenger may be deemed to have filed a timely complaint. ...

*Jensen*, 912 F.2d at 522-23 (citations omitted) (emphasis in original).

Plaintiff's claim is closely analogous to what the First Circuit termed a serial violation in *Jensen v. Frank*, 912 F.2d at 522. Plaintiff asserts that Volkert continually denied her a promotion to Assistant Vice President based on the same actionable animus, her race. As such, her claims as alleged under § 1981 are not barred by the statute of limitations.

### 2.   *McDonnell Douglas* Analysis

Section 1981 requires proof of intentional discrimination. ... The Supreme Court has held that the test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discriminatory treatment cases. ... Under the familiar *McDonnell Douglas/Burdine* framework, the court employs a three part test designed to determine the motivation of the defendant in taking the challenged action. ...

*Brown v. American Honda Motor Company, Inc.*, 939 F.2d 946, 949 (11th Cir. 1991) (citations omitted).

A plaintiff establishes a *prima facie* case of discrimination for a failure to promote her into a position for which the employer is seeking applicants, but which remains open (*i.e.*, unfilled) following the plaintiff's rejection, by showing: (1) she is a member of a protected class; (2) she

applied for, and was qualified to fill, a position for which the defendant was accepting applications; (3) despite her qualifications, she was rejected for promotion; and (4) after her rejection, the position remained open and the employer continued to seek applications from persons with plaintiff's qualifications, but who were not members of her protected class. *See, e.g., Walker v. Mortham*, 158 F.3d 1177, 1179 n.2, 1185-86 (11th Cir. 1998) (Title VII racially discriminatory hiring and promotional practices.). *Cf., e.g., McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (failure to hire based on plaintiff's race); *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1267, 1268 (11th Cir. 1999) (failure to hire based on white male applicant's race and gender).

The current case is slightly different from a standard failure to promote case. Plaintiff did not apply for promotion to a position for which Volkert was actively accepting applications. Consequently, Volkert could not continue to seek applications from persons with plaintiff's qualifications, but who were not members of her protected class. Thus, in this case, plaintiff must show that she is a member of a protected class; that she is qualified for the position which she seeks; that she was rejected despite her qualifications; and that her status as a member of a protected class was the basis for her rejection.

Plaintiff clearly is a member of a protected class, African-American. She also has established that she is qualified for the position due to her educational background and experience. Furthermore, Volkert does not dispute that she is qualified to hold the title of Assistant Vice President or Vice President, or that she was denied promotion to such a position. Thus, plaintiff's *prima facie* case hinges on whether she can show that her race was the basis for her rejection for promotion. Plaintiff argues that the following facts demonstrate that her race was the reason she was denied a promotion:

36

(a) she received undeserved negative performance appraisals, (b) other employees were treated in a more favorable manner, and (c) out of 500 employees and 45 officers, not one executive officer is an African-American.  This court disagrees.

Plaintiff, in support of her contention that Volkert failed to promote her based solely on her race, merely contends that her performance appraisals were undeserved; however, such a conclusory statement is insufficient to properly establish a *prima facie* case of discrimination.  Garratt's comments on plaintiff's various appraisal forms were sufficiently detailed to afford plaintiff the opportunity to respond to each negative criticism and show this court why each criticism evidences a discriminatory intent.

Garratt, in his 1998 appraisal of plaintiff's work, stated that, even though plaintiff had made significant contributions to several successful solicitations, she "fails to acknowledge the contributions of other team members," and continues to claim "that successes are based solely on [her] relationships with certain contacts."  Garratt further noted that plaintiff needs to "cooperate with others and share relevant information with team members in a timely and factual manner," to "accept the guidance of Volkert's officers before making marketing calls and follow instructions/guidance received."[132]  As to plaintiff's 1999 appraisal, Garratt noted:

Overall Progress on "Improvement Areas" from 8/31/99 appraisal:

Identifying New Clients/Projects — some progress had been made ... but emphasis on information (see improvement areas below) is still needed.

Team Work/Cooperation — no substantive progress.

Following Guidance — no substantive progress.

---

[132] Defendant's evidentiary submission (doc. no 38), Tab A, Exhibit 11, at unnumbered page 3.

Work Habits — no progress.

...

MAJOR AREA(S) OF FOCUS/IMPROVEMENT (CONTINUED)

Project Identification/Project Data — this is the single most important failure in your performance. Improvement is still needed in obtaining specific project information (scope, schedule, constr. budget, fee, finding source, selection process, decision maker(s), DVA advocates, etc.) monitoring (and following-up on) selection process, and identifying new projects.

- BAA Boundary Survey — missed opportunity to submit.

- BAA Runway ... Extension — project not identified, even though I had discussed it.

- Jefferson Co. Environmental Program — very little info. ...

- Jefferson Co. Board of Education — no effort to identify projects or programs.

- Birmingham Board of Education — no meaningful info. obtained.

Teamwork is absolutely essential in your role as a marketing manager. Without teamwork you, more than just about anyone in the office, have the potential to misrepresent the firm. In the office, you continue to undermine the team through self-supporting statements and mistrust of others. You must work with others to develop project intelligence/solicitation plans instead of working alone (or limiting who you will work with).

- You continue to emphasize relationships in lieu of facts, e.g. discussing a corporate citizen award and client's statement that supportive corporations will get school assignments when asked for facts on client's upcoming CM/Architectural program.

- You have stated repeatedly that Jefferson C. Envir. Services contract volume has increased because of your relationship w/ the Commissioner.

Cooperation — you continue to be critical of other team members.

- Critical of Mr. Faulkner in presence of client.

38

- In the office, you are sometimes very rude to others who are trying to be helpful.

See/Accept Guidance — and use good judgment when talking w/ potential clients.

- unsolicited an inappropriate advice to local may...[indiscernable]

- be open to guidance/help when it is offered.

Work Habits — while your job requires you to be out of the office a lot, it is very important that time in the office is spent effectively, interacting with others to coordinate solicitations, share information, seek guidance and offer assistance.

- You are often late in the morning.

- You seldom return to the office in the afternoon.

- You have sometimes blocked your office door closed or not answered the door when in you office and not on the phone.[133]

Garratt's comments on plaintiff's 2000 appraisal form include the following specific criticisms:

The Birmingham office marketing program has been successful this year, meeting & exceeding our local area goal for the first time ever.  Jacqueline has contributed to the marking team's success on such projects as ...

...

- Project Information — still need to be more specific in obtaining & reporting information such as scope, budget, funding source, selection process, schedule, decision makers, etc.

- Communication/Cooperation — improvement still needed in keeping team members informed and in being more cooperative/responsive to others on the solicitation team.

- Marketing Calls — revise schedule/frequency of calls to improve effectiveness & results.  Some contacts don't need to be made as often. Others may need to be more often.[134]

---

[133] *Id.* at Tab A, Exhibits 39, at unnumbered page 5-7 (emphasis in original).

[134] *Id.*, Tab A, Exhibit 45, at unnumbered page 3 (emphasis in original).

During his deposition Garratt gave further examples of plaintiff's failure to properly market clients and to properly research potential engineering work.[135] He testified that James Faulkner, Vice Chairman of the Board, Mark Dolan, Chief Engineer, and other co-employees indicated that plaintiff was not an effective team member.[136] Plaintiff also failed either to obtain or to share specific details of potential projects with Garratt or with other employee(s).[137]

Plaintiff offers no evidence tending to indicate that these appraisals or any comment contained therein were negative based solely on her race. Rather, plaintiff merely argues that Garratt's assessment was unfair and discriminatory. However, her mere disagreement with her supervisor's assessment is not sufficient to establish a *prima facie* case of racial discrimination. As the Eleventh Circuit held in *Chapman v. AI Transport*, 229 F.3d 1012 (11th Cir. 2000) (en banc),

> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason. *See Alexander v. Fulton County, Ga.*, 207 F.3d at 1341 (Title VII case) ("[I]t is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated."); *Combs*, 106 F.3d at 1541-43. We have recognized previously and we reiterate today that:
>
> > [f]ederal courts "do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior."

*Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988) (citations omitted)); *see also Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181,

---

[135] *Id.*, Tab B, at 83-100, *see also* Plaintiff's evidentiary submission (doc. no. 43), Tab 1, at 167-169.

[136] Plaintiff's evidentiary submission (doc. no. 43), Tab 1, at 173-181.

[137] Defendant's evidentiary submission (doc. no. 38), Tab B, at 83-100.

> 1187 (11th Cir. 1984) (An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."); *Abel v. Dubberly*, 210 F.3d 1334, 1339 n.5 (11th Cir. 2000). We "do not . . . second-guess the business judgment of employers." *Combs*, 106 F.3d at 1543; *accord Alexander*, 207 F.3d at 1339, 1341; *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) ("We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law. We are not in the business of adjudging whether employment decisions are prudent or fair." (internal citation omitted)).

*Chapman*, 229 F.3d at 1030 (footnotes omitted).

Garratt's criticism of plaintiff's work performance is sufficiently clear and reasonably specific to afford plaintiff the opportunity to demonstrate the racial motivation behind Garratt's negative criticisms. *See Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 258, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981). However, she offers only her belief that Garratt's appraisal of her work is unfair and discriminatory. As discussed above, such an argument is not sufficient to establish a *prima facie* case of discrimination on the part of her employer.

Plaintiff also asserts that Volkert's discrimination is "obvious," when viewed in light of Volkert's treatment of other marketing employees. As comparators, plaintiff asserts that:

> Jimmy Faulkner, a white male, is an employee in the Mobile office who is "dedicated to marketing."... Charles Munden, a Regional Vice President, is another white male in the company's Mobile office who does primarily marketing. ... Audrey Perine, who held Ms. Franklin's position prior to Ms. Franklin being hired, was also an Assistant Vice President.[138]

The employees cited by plaintiff as comparators are not necessarily similarly situated employees. Plaintiff, in deposition, explained why she believes Faulkner is similarly situated.

> A.   I believe that I'm similarly situated with him because we do very much the same job outside of his executive role as chairman of the board. We are both

---

[138] Plaintiff's Brief in Opposition to Motion for Summary Judgment at 4.

41

charged with marketing major customers with regard to the firm.[139]

As to Charles Munden, plaintiff stated:

> A.   First, let me state that prior to now Mr. Munden operated as vice president of operations, so I understand that he had additional responsibilities on top of being charged with marketing and bringing projects to the table that would add to the bottom line for the firm.[140]

Garratt, in deposition, described Franklin's duties as approximately eighty to ninety percent marketing and ten to twenty percent public relations. He further stated that Perine's duties while with Volkert were virtually the same, except that she spent approximately two percent of her time working on technical matters.[141]  Plaintiff, through her own statements, admits that the employees she asserts are comparators are not truly comparable.  Faulkner, in addition to his marketing duties, is acting chairman of the board.   Munden, formerly Garratt's supervisor, has additional responsibilities other than marketing.  Currently he is Volkert's Regional Vice President.[142]

Plaintiff also asserts Perine as a comparator.  Perine's job duties while working with Volkert do seem more analogous to plaintiff's than the other employees cited.  Perine also is African-American, thus a member of the same protected class as plaintiff.  Perine, while a certified engineer, primarily worked as a marketer.  Furthermore, Perine, like plaintiff, worked under Garratt's supervision.  However, Perine, unlike plaintiff, was promoted to Assistant Vice President.  Garratt did not nominate Perine for the promotion to Vice President, but he did support her promotion.[143]  Thus, while plaintiff argues that Perine's promotion evidences Volkert's discriminatory intent, in

---

[139] Defendant's evidentiary submission (doc. no. 38), Tab A (plaintiff's December 13, 2000, deposition), at 364.

[140] *Id.* at 379.

[141] *Id.*, Tab B, at 36-37.

[142] *Id.* at 68.

[143] *Id.* at 29.

reality, Volkert's promotion of Perine to Assistant Vice President with Garratt's support seems more indicative of a lack of discriminatory intent.

Plaintiff also asserts that Clifton Lambert's finding during Volkert's internal grievance hearing that plaintiff was discriminated against on the basis of her race indicates Volkert's true intent. However, when asked why he found Garratt's actions racially motivated, Lambert responded that "[Garratt] didn't effectively prove to me that he didn't discriminate from a racial point of view."[144]   Lambert did not articulate any specific reason to support his finding of racial discrimination; he simply based his findings on a lack of evidence. In any event, Lambert's *opinion* as to Garratt's subjective motivation is not an evidentiary basis upon which plaintiff can construct a *prima facie* case.

Next, plaintiff relies on statistical evidence indicating that "among the company's almost 500 employees and 45 officers, there is not one African-American Assistant Vice President or Vice President."[145]  Of the three forms of proof — statistical, direct, and circumstantial evidence — the first generally is accorded the least probative value in Title VII disparate treatment cases prosecuted by individual plaintiffs. The Eleventh Circuit holds that "statistics alone cannot make a case of individual disparate treatment." *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 n.5 (11th Cir. 1998) (quoting *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1131 (11th Cir. 1984) (distinguishing individual cases from class action cases where statistics, if strong enough, can carry the plaintiff class' initial burden of production in the establishment of a prima facie case) (internal quotation marks omitted)). *See also Combs v. Plantation Patterns*, 106 F.3d 1519, 1527

---

[144] *Id.*, Tab D, at 143.

[145] Plaintiff's Brief in Opposition to Motion for Summary Judgment at 18.

n.3 (11th Cir. 1997) (rejecting plaintiff's statistical evidence as "undeveloped and without analytical

foundation"), *cert. denied sub nom. Combs v. Meadowcraft Co.*, 522 U.S. 685, 118 S.Ct. 685, 139

L. Ed. 2d 632 (1998); *Brown v. American Honda*, 939 F.2d at 952-53 (noting that statistics without

analytical foundation are "virtually meaningless").

Statistical evidence has been held insufficient to give rise to a presumption of discriminatory

intent, or to demonstrate pretext, when it "'fail[s] to compare similarly situated individuals and

fail[s] to eliminate nondiscriminatory reasons for the numerical disparities.'" *Toth v. McDonnell

Douglas Aerospace Services Co.*, 31 F. Supp. 2d 1347, 1354 (M.D. Fla. 1998) (quoting *Doan v.

Seagate Technology, Inc.* 82 F.3d 974, 979 (10th Cir. 1996)); *see also Krieg v. Paul Revere Life

Insurance Co.*, 718 F.2d 998 (11th Cir. 1983) (ADEA action holding that statistics did not establish

pretext in individual disparate treatment case) ("Even if the statistics did show that the company

sometimes discriminates because of age, which is the best they could show because some general

managers in the protected age group were not discharged, they did not show that the company did

so in this instance."), *cert denied*, 466 U.S. 929 (1984); *Brown v. McDonnell Douglas Corp.*, 113

F.3d 139, 142 (8th Cir. 1997) (statistical evidence held not probative of pretext because it failed to

analyze treatment of comparable employees and ignored performance evaluations); *Hutson v.

McDonnell Douglas Corp.*, 63 F.3d 771, 777-78 (8th Cir. 1995) (statistical evidence held not

probative of pretext because it failed to analyze treatment of comparable employees); *Simpson v.

Midland-Ross Corp.*, 823 F.2d 937 (6th Cir. 1987) ("Unless the statistics, standing alone or in

comparison, are sufficient to lead the mind naturally to the conclusion sought, they have no

probative value....").

The statistics relied upon by plaintiff are unpersuasive.  Plaintiff does not provide the court

with any analytical framework for viewing the statistics upon which she relies. She does not provide a breakdown of how many employees are black, how many have sought a promotion to Assistant Vice President or Vice President, or how many employees, black or white, have been denied such a promotion. Plaintiff also fails to make any statistical comparison or analysis as to employee appraisals among the 500 employees or 45 officers, or even as to those employees evaluated by her immediate supervisor, Garratt.

Plaintiff offers no other evidence in support of her assertion that Volkert denied her the promotion based on her race. She does not offer any evidence indicating that there were other employees belonging to a non-protected class that were subjected to negative evaluations, such as plaintiff's, but received a promotion to Assistant Vice President or Vice President, despite the negative evaluations. Nor does she offer any evidence of other employees of her same race that were treated in the same or similar manner as plaintiff, and also denied a promotion to Assistant Vice President or Vice President. Thus, plaintiff's proffer of "proof" in support of her *prima facie* case amounts to nothing more than a conclusory assertion of discrimination without any analytical basis for making such an assertion. Therefore, Volkert's motion for summary judgment as to plaintiff's claims of disparate treatment based on her race under § 1981 is due to be granted.

## C.     Plaintiff's Retaliation Claims

"Retaliation is a separate violation of Title VII." *Gupta v. Florida Board of Regents*, 212 F.3d 571, 586 (11th Cir. 2000). Section 704(a) of Title VII of the Civil Rights Act of 1964 provides protection for employees who oppose or participate in activities to correct an employer's discriminatory practices.

> It shall be an unlawful employment practice for an employer to discriminate

45

against any of his employees or applicants for employment ... because he [the employee] has opposed any practice made an unlawful employment practice by this subchapter [of Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter [of Title VII].

42 U.S.C. § 2000e-3(a).  As discussed above, plaintiff's claims under Title VII are barred by the statute of limitations; however, she may still recover on the basis of retaliation under § 1981.

Although § 1981 does not contain a prohibition against retaliation, the Eleventh Circuit has held that retaliation claims are cognizable under § 1981.  *See Andrews v. Lakeshore Rehabilitation Hospital*, 140 F.3d 1405, 1409-13 (11th Cir. 1998).  As discussed earlier, however, the protection of § 1981 is limited to cases of discrimination and retaliation on the basis of race.  *Little v. United Technologies*, 103 F.3d at 961.  Still, both Title VII and § 1981 require a plaintiff to demonstrate that she engaged in statutorily protected activity to establish a prima facie case of retaliation.  *See Sullivan v. National Railroad Passenger Corp.*, 170 F.3d 1056, 1058-61 (11th Cir. 1999) (treating the sufficiency of the evidence to sustain a retaliation claim brought under Title VII and § 1981 with a single analysis); *Moss v. W&A Cleaners*, 111 F.Supp.2d 1181 (M.D. Ala. 2000)*; Holiness v. Moore-Handley, Inc.*, 114 F.Supp.1176,1185 (N.D. Ala. 1999).

Plaintiff must prove three elements to establish a prima facie cases of retaliation:  (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there was a causal linkage between the protected activity and the adverse employment action.  *See, e.g., Bass*, 256 F.3d at 1117 (Title VII); *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 798 (11th Cir. 2000) (FMLA); *Gupta*, 212 F.3d at 587 (Title VII); *Farley v. Nationwide Mutual Insurance Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (ADA); *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1455 (11th Cir. 1998) (Title VII); *Little v. United Technologies*, 103 F.3d at 959 (Title

46

VII); *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994) (Title VII); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

Plaintiff's brief in opposition to summary judgment is void of any argument in support of her retaliation claim. As stated previously, when opposing a motion for summary judgment "a party may not rely on his pleadings to avoid judgment against him." *Ryan v. International Union of Operating Engineers, Local 675*, 794 F.2d at 643. There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. *See Blue Cross & Blue Shield v. Weitz*, 913 F. 2d at 1550. "Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d at 599. Therefore, this court finds that defendant's motion for summary judgment on plaintiff's retaliation claim, regardless of whether it is bottomed upon Title VII or 42 U.S.C. § 1981, is due to be granted.

A separate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this  5th  day of February, 2002.

United States District Judge

47